1  Marisa Rodriguez-Shapoval, Esq.
   California Bar No. 302836
2  mrodriguez-shapoval@wwhgd.com
   Jeremy R. Alberts, Esq.
3  *Admitted Pro Hac Vice*
   jalberts@wwhgd.com
4  WEINBERG, WHEELER, HUDGINS,
     GUNN & DIAL, LLC
5  6385 S. Rainbow Boulevard, Suite 400
6  Las Vegas, Nevada 89118
   Telephone: (702) 938-3838
7  Facsimile: (702) 938-3864

8  Andrea Alexander, Esq.
   California Bar No. 224067
9  ana@alexanderlawpc.com
   Alexander Law Group, PC
10 10960 Ventura Blvd, Second Floor
   Studio City, CA 91604
11 Telephone:  (818) 237-3179
   Facsimile:   (702) 938-3864
12 Of Counsel
   WEINBERG, WHEELER, HUDGINS,
13   GUNN & DIAL, LLC

14 *Attorneys for Victor Valley Transit Authority;*
15 *Dinorah Aguilar; Transdev Services, Inc.,*
   *and; Veolia Transportation Services, Inc.*

16
17            **UNITED STATES DISTRICT COURT**

              **CENTRAL DISTRICT OF CALIFORNIA**
18
   MARGARET   KEIPER   and   DAIL        Lead Case No. **5:15-cv-00703-BRO(SPx)**
19 KEIPER, JR., DAIL KEIPER, SR.,        (Consolidated 5:15-cv-00762-BRO(SPx);
                                         and 5:15-cv-01481-BRO(SPx))
20              Plaintiffs,

21       v.

22 VICTOR    VALLEY    TRANSIT           **OPPOSITION OF THE BUS**
   AUTHORITY; DINORAH AGUILAR;          **PLAINTIFFS TO THE UNITED**
23 TRANSDEV    SERVICES,    INC.;       **STATES OF AMERICA'S MOTION**
   VEOLIA     TRANSPORTATION            **TO DISMISS THIRD PARTY**
24 SERVICES, INC.; STEVEN KILTY;         **COMPLAINT**
   FBN   TRANSPORTATION,   LLC;
25 MARDAN TRANSPORTATION LLC;
   AMSTON SUPPLY, INC.; and DOES 1
26 through 100, inclusive,

27              Defendants.

28 AND ALL REALTED ACTIONS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WEINBERG WHEELER
HUDGINS GUNN & DIAL

# **TABLE OF CONTENTS**

I.   INTRODUCTION ..................................................................................... 5

II.  LEGAL STANDARD ............................................................................. 6

    A.   THE BUS PLAINTIFFS' THIRD PARTY COMPLAINT INVOKES
         THE FEDERAL TORT CLAIMS ACT ............................................ 6

    B.   THE ARMY BEARS THE BURDEN OF PROVING THAT THE
         DISCRETIONARY FUNCTION EXCEPTION APPLIES. .............. 7

III. ARGUMENT ........................................................................................... 7

    A.   THE ARMY'S MOTION TO DISMISS SHOULD BE DENIED
         BECAUSE THE ARMY HAS FAILED TO DISCHARGE ITS
         BURDEN OF PROVING THAT THE DISCRETIONARY
         FUNCTION EXCEPTION APPLIES. ............................................... 9

         1.   THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT PROTECT
              THE ARMY'S FAILURE TO PROVIDE MANDATORY WARNING
              SIGNS. ...................................................................................... 9

         2.   THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT APPLY
              BECAUSE THE MUTCD WAS NOT CREATED UNDER THE
              CONSIDERATION OF SOCIAL, ECONOMIC, AND POLITICAL POLICY,
              NOR WAS THE ARMY'S FAILURE TO INSTALL MANDATORY
              WARNING SIGNS A CONSIDERATION OF SOCIAL, ECONOMIC AND
              POLITICAL POLICIES. ........................................................... 14

IV.  CONCLUSION ..................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987) .............. 21

*Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988) ....................... 7, 9, 12, 15

*Blackburn v. United States*, 100 F.3d 1426, 1434 (9th Cir. 1996)........................ 21

*Childers v. United States*, 40 F.3d 973 (9th Cir. 1995) ....................................... 20

*Faber v. United States*, 56 F.3d 1122, 1127 (9th Cir. 1995) ............................... 20

*Gaubert*, 499 U.S. at 324-25, n. 7.................................................................... 16

*Hughes v. United States*, 116 F.Supp.2d 1145, 1152 (N.D. Cal. 2000) 15, 16, 18, 19

*Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1026 (9th Cir. 1989)....12, 14

*O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002) ......................... 6, 9

*Prescott v. United States*, 973 F.2d 696, 701-02 (9th Cir. 1992) .......................... 7

*Senger v. United States*, 103 F.3d 1437, 1444 (9th Cir. 1996) .............................. 7

*Seyler v. United States*, 832 F.2d 120, 123 (9th Cir. 1987)...........................20, 21

*Summers v. United States*, 905 F.2d 1212, 1215-16 (9th Cir. 1990).................... 19

*Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994)......................................9, 20

*Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008) ............................ 7

*United States v. Gaubert*, 499 U.S. 315, 322 (1991) .......................................7, 12

*United States v. Varig Airlines*, 467 U.S. 797, 813 (1984) ................................... 7

*Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) ............................... 20

*Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) ......................... 18

**Statutes**

23 C.F.R. § 655.601 ............................................................................................ 9

23 C.F.R. § 655.603(a) ....................................................................................... 9

23 C.F.R. § 655.603(b)(1).................................................................................. 10

28 U.S.C. §§ 1346(b)........................................................................................... 6

28 USC § 1346(b) ............................................................................................... 6

32 CFR 634.4(h)(3) ........................................................................................... 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WEINBERG WHEELER
HUDGINS GUNN & DIAL

**Regulations**

Army Regulation ("AR") 55-80, Ch. 3-11c(3)(c) (2003) ..................................... 10

*DoD Supplement to the National MUTCD*, pg. ii, (2015) ..............................12, 13

MUTCD (1935) .............................................................................................. 17

MUTCD (CA) § 3B.22 (Ed. 2003 Rev. 1) ......................................................9, 12

MUTCD Standard 3B.22 ................................................................................ 11

MUTCD, § 1A.13(A) (2009) ......................................................................10, 13

NTC Regulation 190-5, § 1-5(b) ....................................................................8, 10

Victor Valley Transit Authority ("VVTA"); Transdev Services, Inc. ("Transdev"); Veolia Transportation Services, Inc. ("Veolia"), and Dinorah Aguilar ("Aguilar") (collectively, "Bus Plaintiffs"), by and through their counsel, the law firm of WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC, hereby submit this Opposition to the *United States' Motion to Dismiss Third-Party Complaint Filed by Bus Defendants* (Doc. #136-1).

## I.  INTRODUCTION

This case centers on an automobile accident that occurred in the early morning hours of June 2, 2014, on a bypass road leading to Fort Irwin National Training Center, a military base located in the Mojave Desert. A bus, operated by the VVTA, was on its regular route to the base when it collided with a tractor trailer that had been parked in the right lane of the bypass road. Prior to the collision, the driver of the tractor trailer had turned off the engine, turned off all of the lights, and failed to set up any cones, flares or any other warning signals that would indicate that a tractor trailer was parked in an active lane of traffic.

Because the collision occurred during the pre-dawn hours, the bus driver saw the tractor trailer just seconds before the impact. The bus driver swerved left to avoid the tractor trailer, but the right side of the bus crashed into the left side of the tractor trailer, which resulted in the death of one passenger and injuries to several others.

Suit was brought by the occupants of the bus against Steven Kilty, FBN Transportation, Inc., Mardan Transportation, LLC, Amston Supply, Inc. (collectively, "the Trucking Plaintiffs") and the Bus Plaintiffs. Subsequently, the Bus Plaintiffs and the Trucking Plaintiffs filed Third-Party Complaints against the United States (hereinafter, "United States," or "Army") under the Federal Tort Claims Act ("FTCA").

The United States is open to suit under the FTCA. However, the FTCA exempts claims based upon the performance or failure to perform a discretionary

function or duty, which is commonly referred to as the discretionary function exception ("DFE").

Here, the Army has filed a *Motion to Dismiss* (Doc. #136-1) claiming that the DFE bars the Bus Plaintiffs' claims. The DFE is a two-part test that focuses on the Army's ability to make decisions free from any liability that may result from that decision. The Army cannot satisfy either part of the two-part test. First, the Army did not have *discretion* to ignore a specific and mandatory Traffic Control Device regulation, and thus the DFE does not apply and the first element cannot be satisfied. Second, even if the Court finds that the Army has satisfied the first prong (*which is highly unlikely*), the DFE still does not apply because the Army's decision was not grounded in "social, economic, or political policy," which is required under the second element of the test.

## II.    LEGAL STANDARD

### A.    THE BUS PLAINTIFFS' THIRD PARTY COMPLAINT INVOKES THE FEDERAL TORT CLAIMS ACT.

The FTCA is a limited waiver of the government's sovereign immunity and is subject to certain jurisdictional exceptions and exclusions. *See* 28 U.S.C. §§ 1346(b) *et seq.* "[I]n order to effectuate Congress's intent to compensate individuals harmed by government negligence, the FTCA, as a remedial statute, should be construed liberally, and its exceptions should be read narrowly." *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002). The foremost exception is the "discretionary function" exception, which provides that there shall be no liability under the FTCA on:

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved is abused.

28 USC § 1346(b).

The Supreme Court has prescribed a two-part test for determining the

WEINBERG WHEELER
HUDGINS GUNN & DIAL

applicability of the DFE. *See United States v. Gaubert*, 499 U.S. 315, 322-25 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988). Under the first element, a court must consider "whether the action is a ***matter of choice*** for the acting employee." *Id.* at 536 (emphasis added). The governmental employee ***does not*** have a choice "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Id.*

If the governmental actor ***does*** have discretion in making the choice, then a court must consider the second element of test. Under the second element, a court must consider "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* Which means the choice must be "'grounded in social, economic, and political policy.'" *Id.* at 537 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984)).

### B.   THE ARMY BEARS THE BURDEN OF PROVING THAT THE DISCRETIONARY FUNCTION EXCEPTION APPLIES.

The burden of persuasion on the applicability of the DFE lies solely with the government. *See Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008) ("The United States bears the burden of proving the applicability of the discretionary function exception."); *Prescott v. United States*, 973 F.2d 696, 701-02 (9th Cir. 1992) (the DFE is an affirmative defense and the government bears burden of proof that it applies); *Senger v. United States*, 103 F.3d 1437, 1444 (9th Cir. 1996) (same).

### III.   ARGUMENT

It is important to note that the conduct addressed in the Army's *Motion to Dismiss* (Doc. #136-1 at 9-10) is different from the conduct addressed in this *Opposition*. In their *Motion*, the Army focuses (at 9-10) on its decision to design and build the bypass road.[1] For purposes of this *Opposition*, the Bus Plaintiffs do

---

[1] The Army's *Motion* also focuses on its "discretionary" decision to ignore warnings from other truckers regarding the Trucking Defendants' semi-trailer that was illegally parked in the left lane of the bypass road. For purposes of this *Motion*, the Bus Plaintiffs acknowledge that the Army's decision to ignore warnings from other truckers, while recklessly indifferent to human life and safety, is arguably

WEINBERG WHEELER
HUDGINS GUNN & DIAL

not dispute that the Army's decision to design and build the bypass road is protected under the DFE. However, once the Army made its decision to design and build the bypass road, the Army was required to follow the specific and mandatory design regulations set forth in the Manual on Uniform Traffic Control Devices ("MUTCD"). (*See* Doc. #136-3, Ex. "C" (citing NTC Regulation 190-5, § 2-1(a) ("All traffic control devices and signs will conform to the [MUTCD]'")). The failure to follow these design regulations forms the basis for the Bus Plaintiffs' Third-Party Complaint. (*See Bus Plaintiffs' Third Party Complaint ("Keiper")*, Doc. #73, ¶ 44 (alleging that "said collision was caused in whole or in part by the failure of military personnel in requiring buses to travel on the Truck By-Pass Road without providing a designated travel lane, as it was so designated after the incident."); (*see also Bus Plaintiffs' Third Party Complaint ("Chestnut")*, Doc. #27, ¶ 44); (*see also Bus Plaintiffs' Third Party Complaint ("Aguilar")*, Doc. #7, ¶ 44).

As it relates to the design of the Fort Irwin bypass road, the Army states that its "plan was to . . . direct all bus traffic to the ***left-hand lane*** of the bypass road." (Doc. #136-2, at 8:19-25). By the Army's own admission, the left lane of the bypass road was dedicated to preferential use by bus traffic. (*See id.*). Where, as here, the Army contends that it dedicated the left-lane of the bypass road to bus traffic, the Army was required to install longitudinal "***Bus Only***" markings along the left lane of the bypass road.[2] *See* MUTCD (CA) § 3B.22 (Ed. 2003 Rev. 1, as

---

protected under the DFE because the controlling regulations state that "the [Directorate of Emergency Services] ***may*** . . . [r]emove and temporarily impound a vehicle when it is parked illegally, or for unreasonable periods, as determined by the Garrison Commander or applicable authority." (Doc. #136-3, Ex. "C" (citing NTC Regulation 190-5, § 1-5(b)) (emphasis added).

[2] The Bus Plaintiffs maintain that, prior to the subject incident, the Army never once communicated its intent to designate the left-lane of the bypass road to bus traffic. The Bus Plaintiffs further maintain that, prior to the subject incident, there was no readily available information, warning, instructions or guidance regarding the use of the left and right lanes of the bypass road.

amended for use in California), attached hereto as Exhibit A. Unfortunately, the Army did not install any "*Bus Only*" markings until after the subject incident.

As demonstrated more fully below, the Army's *Motion to Dismiss* should be denied because the Army fails to satisfy either part of the DFE's two-part test.

### A. THE ARMY'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE THE ARMY HAS FAILED TO DISCHARGE ITS BURDEN OF PROVING THAT THE DISCRETIONARY FUNCTION EXCEPTION APPLIES.

#### 1. THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT PROTECT THE ARMY'S FAILURE TO PROVIDE MANDATORY WARNING SIGNS.

The first prong of the *Berkovitz* test asks, "whether the action is a matter of choice for the acting employee." *Berkovitz*, 486 U.S. at 536. Courts can get to this answer by asking: "[d]oes 'a federal statute, regulation, or policy specifically prescribe a course of action' that was not followed?" *O'Toole,* 295 F.3d at 1033 (quoting, *Berkovitz, 486 U.S. at 536*); *see also Sutton v. United States*, 26 F.3d 903, 908 (9th Cir. 1994) ("[t]he discretionary function exception does not protect the government when it elects not to perform a duty that a statute or regulation requires it to perform."). Where a specific regulation exists, the government actor or agency "has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536.

In this case, the Army's design and construction of the bypass road was governed by the Manual on Uniform Traffic Control Devices ("MUTCD"). The MUTCD is a document issued by the Federal Highway Administration ("FHWA") of the United States Department of Transportation that has been incorporated by reference into the Code of Federal Regulations. *See* 23 C.F.R. § 655.601. The MUTCD, as approved by the FHWA, is the "national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel in accordance with 23 U.S.C. 109(d) and 402(a)." 23 C.F.R. § 655.603(a). States and other federal agencies MUTCD's must be in "substantial conformance"

WEINBERG WHEELER HUDGINS GUNN & DIAL

WEINBERG WHEELER
HUDGINS GUNN & DIAL

1   with the national MUTCD. *See* 23 C.F.R. § 655.603(b)(1).

2   The United States Army is one of the many federal agencies that must

3   adhere to the standards set forth in the MUTCD. This is verifiable through a litany

4   of sources. For example, the MUTCD is incorporated by reference in 32 CFR

5   634.4(h)(3) ("The facility engineer [or] engineer officer . . . in close coordination

6   with the law enforcement officer, will . . . [e]nsure that traffic signs, signals, and

7   pavement markings conform to the standards in the current Manual on Uniform

8   Traffic Control Devices for Streets and Highways."). The codification of the

9   MUTCD is also documented in the Army's Regulations. *See* Army Regulation 55-

10  80, Ch. 3-11c(3)(c) (2003) (stating that "[a]ll installation traffic signals, signs, and

11  pavement markings will be in substantial conformance to FHWA's Manual on

12  Uniform Traffic Control Devices for Streets and Highways."), attached hereto as

13  Exhibit B. Finally, even in the documents submitted in support of the Army's own

14  *Motion to Dismiss*, the Army acknowledges that "[a]ll traffic control devices and

15  signs will conform to the [MUTCD]." (Doc. #136-3, Ex. "C" (citing NTC

16  Regulation 190-5, § 2-1(a)).

17  The Army had no choice but to follow all of the mandatory Traffic Control

18  Device "***Standards***" set forth in the MUTCD.[3] In fact, the Army's own regulations

19  state that any deviation from the MUTCD must be approved, in writing, by the

20  Surface Deployment and Distribution Command ("SDDC") and the FHWA. *See*

21

22  [3] It should be noted that the MUTCD provides a variety of direction for Traffic Control Devices
    and not all of the MUTCD's directions are mandatory. By way of example, the MUTCD contains

23  directional "Guidance," which is defined as "a statement of recommended, but not mandatory, practice in
    typical situations, with deviations allowed if engineering judgment or engineering study indicates the

24  deviation to be appropriate. All Guidance statements are labeled, and the text appears in unbold type. The
    verb 'should' is typically used. The verbs 'shall' and 'may' are not used in Guidance statements.

25  Guidance statements are sometimes modified by Options." *See* MUTCD, § 1A.13(B) (2009), attached
    hereto as Exhibit C. The MUTCD further provides for directional "Standards," which is defined as "a

26  statement of required, mandatory, or specifically prohibitive practice regarding a traffic control device.
    All Standard statements are labeled, and the text appears in bold type. The verb 'shall' is typically used.

27  The verbs 'should' and 'may' are not used in Standard statements. Standard statements are sometimes
    modified by Options. Standard statements shall not be modified or compromised based on engineering

28  judgment or engineering study." *See* MUTCD, § 1A.13(A) (2009), attached hereto as Exhibit C.

*id*. As demonstrated below, the Army did not comply with MUTCD Standard 3B.22 and the Army has not provided any evidence that a variance from MUTCD § 3B.22 was obtained from SDDC or the FHWA.

**a. MUTCD § 3B.22 Requires the Use of A Longitudinal "Bus Only" Sign Whenever the Government has Designated Bus Traffic as the Preferential Use of a Particular Lane.**

The Army's *Motion* is supported by the declaration of the Deputy Director of Emergency Services at the National Training Center Fort Irwin ("Deputy Director"). (Doc. #136-2). According to the Army's Deputy Director, the left lane of the bypass road was dedicated to bus traffic. (Doc. #136-2, at 8:19-25 (stating that the Army "directed all bus traffic to the ***left-hand lane*** of the bypass road.")). Further, the Army explicitly states in its *Motion* (at 4:24-27) that it "notified commercial trucking companies and VVTA of the planned procedures, and instructed buses to use the left lane of the bypass road, and commercial truck traffic to use the right lane of the bypass road."[4] By dedicating the lanes of traffic to specific types of vehicles, the Army triggered MUTCD 3B.22, which states that:

> **When a lane is assigned full or part time to a particular class or classes of vehicles, preferential lane markings shall be used**.
>
> **. . . .**
>
> **Where a preferential lane use is established, the preferential lane shall be marked with one or more of the following symbol or word markings for the preferential lane use specified:**
>
> **. . . .**
>
> > **Bus only lane—the preferential lane use marking for a bus only lane shall consist of the word marking BUS ONLY.**

---

[4] As noted above, the Bus Plaintiffs dispute the Army's representations that it "notified commercial trucking companies and VVTA of the planned procedures, and instructed buses to use the left lane of the bypass road, and commercial truck traffic to use the right lane of the bypass road." To the contrary, the Bus Plaintiffs maintain that they first learned of the preferential use of the left-lane for bus traffic only after the subject incident.

1  MUTCD (CA) § 3B.22 (Ed. 2003 Rev. 1, as amended for use in California)
2  (emphasis in original), attached hereto as **Exhibit A**.[5] Applying these standards to
3  the Fort Irwin bypass road, the left lane of the bypass road should have been
4  marked "***BUS ONLY***." *See id.*

5    As previously stated, the bus lane was not appropriately marked with words
6  on the pavement along the left hand lane. (*See* Doc. #136-3, Exhibit "G"").
7  Furthermore, the Army has offered no evidence showing approval for this variance
8  from the MUTCD, as required by the military's own regulations. *See DoD*
9  *Supplement to the National MUTCD*, pg. ii, (2015), attached hereto as **Exhibit D**.
10 Therefore, the DFE ***does not*** protect the Army's conduct in this case because the
11 Army failed to perform a mandatory duty required by statute and/or regulation.

12        **b.    MUTCD § 3B.22 Leaves No Room For Discretion or
13        Choice.**
14    As previously noted, the first element of determining whether the DFE
15 applies to divest a court of subject matter jurisdiction is whether the challenged
16 action "involve[s] an element of judgment or choice." *United States v. Gaubert*,
17 499 U.S. 315, 322 (1991). And, as also noted above where a "federal statute,
18 regulation, or policy specifically prescribes a course of action for an employee to
19 follow," the inquiry is over and the discretionary function does not apply, given
20 that the employee had no choice but to obey the binding regulation. *Berkovitz*, 486
21 U.S. at 536. However, a statute, regulation, or policy only removes discretion
22 "when it is embodied in a *specific* and *mandatory* regulation or statute which
23 creates clear duties incumbent upon governmental actors." *Kennewick Irr. Dist. v.*
24 *United States*, 880 F.2d 1018, 1026 (9th Cir. 1989) (emphasis original). In other

25
26 _____
27        [5] For purposes of this *Opposition*, the Bus Plaintiffs are citing to the California MUTCD (Ed.
2003 Revision 1) because the DoD has stated that "[i]n the interest of statewide uniformity, it is very
important for military installations to not only follow the DOD Supplement, but also the MUTCD that is
specific to their host state." *See DoD Supplement to the National MUTCD*, pg. iii, (2015), attached hereto
28 as **Exhibit D**. However, it should be noted that the provision at issue in this *Opposition* is nearly identical
in both the California MUTCD and the National MUTCD.

WEINBERG WHEELER
HUDGINS GUNN & DIAL

WEINBERG WHEELER
HUDGINS GUNN & DIAL

words, if the statute or regulation leaves the governmental actor an element of choice, then it is not specific or mandatory.

Here, Section 3B.22 of the California MUTCD provides a mandatory "Standard" that left the Army no element of choice. The MUTCD's definition of "Standard" leaves no wiggle room. Standards "*shall*" be carried out; "should" or "may" does not apply to them. *See* MUTCD, § 1A.13(B) (2009), attached hereto as **Exhibit C**. Therefore, the MUTCD, and more specifically, MUTCD § 3B.22 is a regulation that specifically prescribes a course of action that the Army *must follow*.

In the present case, the documents cited in support of the Army's own *Motion to Dismiss* demonstrate that the MUTCD is a mandatory requirement. The Army's Deputy Director of Emergency Services has testified that he is "responsible for developing a comprehensive traffic safety program for vehicle traffic within the physical boundaries of the base. In carrying out this responsibility, [he is] guided by policies published at. . . the base level (see, e.g., *NTC Regulation 190-5*, Motor Vehicle Traffic Supervision)." (Doc. #137-2, ¶ 3) (emphasis added). NTC Regulation 190-5 "prescribes the policies, responsibilities, delegations and procedures for managing and administrating the National Training Center (NTC) & Fort Irwin motor vehicle traffic program." (Doc. #136-3, pg. 81). Chapter 2-1 of NTC Regulation 190-5 states that "[a]ll traffic control devices and signs *will* conform to the 'Manual of Uniform Traffic Control Devices for Streets and Highways.'" (*Id*) (emphasis added).

Further, according to "Multi-Service Regulation (AR 55-80 . . . ,): 'Variances in the design and application of installation traffic control devices from the standards contained in the MUTCD must be approved by Surface Deployment and Distribution Command Transportation Engineering Agency (SDDCTEA) and Federal Highway Administration (FHWA).'" *See DoD Supplement to the National MUTCD*, pg. ii, (2015), attached hereto as **Exhibit D**. Thus, if the Army intended to deviate from the MUTCD, it was required to get approval from the SDDCTEA

1  and the FHWA. *Id*. The Army has not offered any evidence that such approval was

2  granted.

3      In sum, in the analysis of whether the DFE should apply, the inquiry must

4  stop at the first prong, as there is a specific and mandatory regulation to follow,

5  leaving the Army with no choice to make. The Ninth Circuit has explained the

6  rationale of ending the inquiry after the first prong as follows:

> The rationale behind excluding from immunity under the
> discretionary function exception conduct which violates
> specific mandatory safety standards is simple. Once the
> government, having balanced economic, social and
> political policy considerations, adopts safety standards in
> the form of specific and mandatory regulations or policy,
> employees do not have any discretion to violate these
> standards. Indeed, to insulate such violations from
> liability would undermine the prior exercise of a
> discretionary function involved in formulating and
> adopting the binding standards.

13  *Kennewick Irr. Dist. v. United States.*, 880 F.2d 1018, 1026-27 (9th Cir. 1989).

14      The government has properly used its discretion in adopting the MUTCD as

15  a safety standard; it must now live with that choice and the consequences that

16  come with not following it.

17      **2.  THE DISCRETIONARY FUNCTION EXCEPTION DOES NOT
        APPLY BECAUSE THE MUTCD WAS NOT CREATED UNDER
        THE CONSIDERATION OF SOCIAL, ECONOMIC, AND POLITICAL
        POLICY, NOR WAS THE ARMY'S FAILURE TO INSTALL
        MANDATORY "BUS ONLY" MARKINGS A CONSIDERATION OF
        SOCIAL, ECONOMIC AND POLITICAL POLICIES.**

21      The Bus Plaintiffs submit that the DFE analysis must end at the first prong.

22  However unlikely, assuming *arguendo* that this Court holds that the Army has

23  satisfied the first element of the test–finding that the MUTCD § 3B.22 is not

24  mandatory and that the Army's failure to properly mark the bus lane involved an

25  element of choice–we turn to the second prong of the DFE test.

26      Under the second element of the test, courts must ask whether the kind of

27  judgment or choice that was involved is one "that the discretionary function

28  exception was designed to shield," i.e., the kind of judgment or choice that would

WEINBERG WHEELER HUDGINS GUNN & DIAL

WEINBERG WHEELER
HUDGINS GUNN & DIAL

be "grounded in social, economic, and political policy." *Berkovitz*, 486 U.S. at 536-37. If so, the exception applies and the government is immune from liability. If not, the exception does not apply and the Court must deny the Army's *Motion to Dismiss.*

Courts have rightly pointed out that the second element of the test is much more difficult to understand than the first element. *See Hughes v. United States*, 116 F.Supp.2d 1145, 1152 (N.D. Cal. 2000). This stems from the fact that it is difficult to draw the line between cases where Congress felt government needed to be immunized in order for the government to perform its responsibilities, and the kinds of acts or decisions that could give rise to liability without creating any serious threat to the ability of the government to meet its responsibilities. *Id*. Relatedly, almost every decision by a governmental actor is arguably grounded in social, economic, and political policy. *Id*. However, Congress could not have intended that **every decision** by a governmental actor be so interpreted, or the entire FTCA would be swallowed up the DFE exception. *Id*. Also, if courts found all decisions to be grounded in social, economic, and political policy, then the exception would in reality only consist of the first element, which is a result that Supreme Court could accomplish, but has chosen not to do so. *Id*. Thus, passing the first hurdle of the two part test is not a *de facto* victory for the Army.

In order to assess whether the decision to not mark the pavement with "BUS ONLY" along the road was a decision rooted in social, economic, and political policy, the Court must focus on the relationship between the specific decision itself and the "regulatory environment" in which that decision was made. *Id*. at 1153. By "regulatory environment" courts mean the applicable regulations, statutes, and policies that apply to the decision-maker. *Id*. In this case, the "regulatory environment" is the MUTCD. *Id*.

Next, the Court must answer the following questions: what are "the purposes that the regulatory scheme seeks to accomplish?"; what are the "policies which led

WEINBERG WHEELER
HUDGINS GUNN & DIAL

to the promulgation of the regulations?"; and, what are "the 'topics' or subjects that are addressed by the regulations or guidelines or statements of policy that form the setting in which the decision in issue is to be made." *Id*. (quoting *Gaubert*, 499 U.S. at 324-25, n. 7). After considering these questions, the Court must turn its attention to the specific decision (i.e., whether or not to mark the left lane of the bypass road with the words "BUS ONLY"). *Id*.

The Court must then ask if the regulatory environment addresses the kind of decision that serves as the basis for the plaintiff's claim (i.e., did the MUTCD address the issue of marking preferential lanes). *Id*. If the decision was addressed in the regulatory environment within which the government official was working, and if the regulations confer discretion on the official when making the decision (*which would have to be the case for the court to have proceeded to consideration of the second element in the DFE test[6]*), then "the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Id*. at 1154, (quoting *Gaubert*, 499 U.S. at 324). In other words, if the policies behind the regulation were rooted in social, economic, and political policies, then the decision, which is addressed in the regulation, is presumed to be rooted in the same social, economic, and political policies. This also shifts the burden of proof from the government to the party bringing suit against the government. Thus, the government no longer has the burden of proving the DFE applies, the plaintiff has the burden of proving by clear and convincing evidence that the DFE does not apply.

This presumption can be overcome by the plaintiff in one of two ways. First, the plaintiff may show that the pertinent regulations were not the product of consideration of public policy when they were drafted. *Id*. at 1154. If this were

---

[6] The Bus Plaintiffs again emphasize that they believe that the Army cannot satisfy the first prong of the test, as the MUTCD *does not* give discretion in marking the preferential lanes.

shown, then it would follow that the decision contemplated by the regulation was also not rooted in public policy. *Id*. Second, the plaintiff may show that even though the applicable regulation is grounded in public policy, the decision itself, while mentioned by the regulation, is divorced from the policies underlying the regulation. *Id*. at 1154-55. In other words, while the regulation is grounded in social, economic, and political policy, the decision is not grounded in the policies.

Again, the decision at issue here is about whether to mark the left lane of the bypass road with the words "BUS ONLY." The regulatory environment in which the decision to mark preferential lanes is the MUTCD.

Answering the first question that applies to the regulatory environment, the purpose of the MUTCD, as explained by the FHWA, is to provide uniformity of signs, signals, and pavement markings in order to promote highway safety and efficiency on the Nation's streets and highways. *See* U.S. Department of Transportation, http://mutcd.fhwa.dot.gov/knowledge/faqs/faq_general.htm (last visited Dec. 10, 2015).

Answering the second question that applies to the regulatory environment, the policies that originally drove the purpose of the MUTCD was safety to vehicles and pedestrians, balanced with cost. *See* MUTCD, pg. 3 (Ed. 1935), attached hereto as **Exhibit E**.

Answering the third question that applies to the regulatory environment, the topic or subject of the regulation is travel, and more specifically, the signs, signals, and pavement markings that help to direct, control, and manage travel. Also, as is laid out extensively above, the MUTCD addresses the issue of marking preferential lanes.

Therefore, the initial application of the analysis shows that, in this case, the burden must be shifted from the government to the Bus Plaintiffs. The Bus Plaintiffs must now demonstrate that the DFE does not apply.

WEINBERG WHEELER
HUDGINS GUNN & DIAL

**a.    The MUTCD Was Not Created With Social, Economic, And Political Policy Considerations In Mind, So The Directive To Mark The Lanes Is Also Not Rooted In Social, Economic, And Political Policy.**

Bearing this shift of burden in mind, and examining the regulatory environment under the questions asked above, it is clear that the purpose, policy, and subject of the MUTCD is not one that implicates social, economic, or political policy, and thus torts that are committed by the government that relate to and implicate the MUTCD are not the type that Congress meant to immunize. This is true because safe and efficient travel does not implicate social, economic, or political policy. Indeed, the considerations within the MUTCD center on "quasi-scientific and quasi-technical bases" that are unrelated to public policy. *Hughes*, 116 F.Supp. at 1158. The considerations of the MUTCD are closer to considerations recognized in *Hughes* – the "likelihood of an accident occurring, the severity of the likely consequences if an accident did occur, the likely effectiveness of warnings etc." *Id*. These considerations were not found to implicate public policy in *Hughes*, and they should not be found to implicate public policy here. *Id*. Also, the Ninth Circuit has explained that "matters of scientific and professional judgment – particularly judgment concerning safety – are rarely considered to be susceptible to social, economic, or political policy." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005).

Therefore, because the MUTCD was not the product of consideration of public policy, then a decision authorized by the regulation, in this case, marking a preferential lane did not involve consideration of public policy, and thus this conduct is not immunized under the DFE.

**b.    Even If The MUTCD Was Created With Social, Economic, or Political Policy Considerations In Mind, The Specific Directive Addressing Marking Lanes Does Not Implicate Social, Economic, Or Political Policy.**

Assuming that the Court disagrees with this analysis, and does find that the MUTCD implicates social, economic, or political policy, the DFE still does not

WEINBERG WHEELER HUDGINS GUNN & DIAL

apply, as the policy considerations underlying this regulation is separate from the policy considerations that underlie the MUTCD. In other words, "even though the kind of decision in issue was in some sense anticipated by the regulations, there is a clear disconnect between the underlying policy purposes that shaped the regulatory environment and that decision." *Hughes*, 116 F.Supp. at 1155.

There is a disconnect between the policy behind installing a "BUS ONLY" marking along the left lane of the bypass road and the policy behind the MUTCD. The only public policy consideration that can be connected to the MUTCD is economic policy. Travel, which is affected by signs, signals, and markings, can have a large economic impact. But, the cost of installing a "BUS ONLY" marking along the left lane of the bypass road is so small as to not rise to a level of being a public policy consideration. Indeed, this is proven by the fact that, after the accident, the Army finally installed a "BUS ONLY" marking along the left lane of the bypass road.

Also, the decision to mark the left lane of the bypass road is related to safety, and not economic policy. There is a large body of case law that addresses when safety considerations implicate public policy and when they do not. The line can be drawn between decisions that focus solely on safety and those that are broader than just safety concerns. Collectively, the cases that follow demonstrate that the decision to mark the left lane of the bypass road is one that focuses solely on safety.

In *Summers v. United States*, 905 F.2d 1212, 1215-16 (9th Cir. 1990), the Ninth Circuit held that the DFE did not protect the Park Service where it had failed to warn visitors of the danger of stepping on hot coals in a fire ring in the Golden Gate National Recreation Area. The court found that "NPS's failure to identify and warn of the danger to barefoot visitors of hot coals on park beaches resembles more a departure from the safety considerations established in Service policies . . . than a mistaken judgment in a matter clearly involving [policy] choices . . . ." *Id.* at

1216. Similarly, in *Faber v. United States*, 56 F.3d 1122, 1127 (9th Cir. 1995), the Ninth Circuit held that the Forest Service's failure to post a sign warning of danger of diving off a waterfall in a National Forest was not protected by the DFE. The Court stated that "[i]t would be wrong to apply the discretionary function exception in a case where a low-level government employee made a judgment not to post a warning sign . . . ." *Id*. at 1125. And, in *Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994), the Court held the Navy's decision not to post speed limit signs after creating a hazard to navigation was not protected by the discretionary function exception, stating that "[a] decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that the discretionary function exception is intended to protect." Finally, in *Seyler v. United States*, 832 F.2d 120, 123 (9th Cir. 1987), the Ninth Circuit held, "we doubt that any decision not to provide adequate signs would be of the nature and quality that Congress intended to shield from tort liability."

However, this case is unlike *Childers v. United States*, 40 F.3d 973 (9th Cir. 1995), where the decision not to post signs and to close portions of Yellowstone National Park was the result of policy decisions regarding how best to manage the park during winter. The court explained:

> Unable to maintain all the trails in the park, cognizant that posting warning signs would inadvertently attract visitors to unmaintained trails, and unable to post signs throughout the park, NPS could only decide to close large portions of the park, or to keep the park open, provide visitors with information on the hazards, and take steps to discourage visitors from going to hazardous areas.

*Id*. at 976. Obviously, closing or opening a National Park has social, economic, and political considerations that are not present when talking about signs, signals, and markings that direct the safe and efficient flow of traffic.

Similarly, in *Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995), the

WEINBERG WHEELER HUDGINS GUNN & DIAL

failure to install warning signs alongside a potentially hazardous stream was held to "implicate[] a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards." *See also Blackburn v. United States*, 100 F.3d 1426, 1434 (9th Cir. 1996) (following *Valdez* and *Childers*, holding the decision how to warn the public of the hazard of diving off a bridge in Yosemite National Park involved considerations of visitor enjoyment, preservation of historical features, minimization of manmade intrusions and protection of wildlife and the environment).

This case law clearly shows that when a decision is centered solely on safety, then it is not protected by the DFE. And, the decision to not install a "BUS ONLY" marking along the left lane of the bypass road was a decision strictly tied to safety, so the reasoning from *Seyler* must apply: "we doubt that any decision not to provide adequate signs would be of the nature and quality that Congress intended to shield from tort liability." *Seyler*, 832 F.2d at 123. Also, the Ninth Circuit has clearly articulated what happens in such a situation: "where the challenged governmental activity involves safety considerations under an established policy, rather than the balancing of competing policy considerations, the rationale for the exception falls away . . . [.]" *.ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir. 1987).

In sum, the Army's decision not to install a "BUS ONLY" marking along the left lane of the bypass road was not shielded by the DFE, as the choice was not grounded in social, economic, or political policy. Instead, the decision turned on safety and efficiency concerns, which are not the type of decisions that Congress meant to protect under the DFE.

WEINBERG WHEELER
HUDGINS GUNN & DIAL

## IV.   CONCLUSION

The Bus Plaintiffs ask this Court to deny the Army's *Motion* because the DFE is inapplicable in this case and this Court has subject matter jurisdiction over the government.

Dated this 14th day of December, 2015.

WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

/s/ Jeremy R. Alberts_____
Marisa Rodriguez-Shapoval, Esq.
Jeremy R. Alberts, Esq.
WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC
6385 S. Rainbow Boulevard, Suite 400
Las Vegas, Nevada  89118

Andrea Alexander, Esq.
Alexander Law Group, PC
10960 Ventura Blvd, Second Floor
Studio City, CA 91604
Of Counsel
WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC

*Attorneys for Victor Valley Transit Authority; Dinorah Aguilar; Transdev Services, Inc.; and Veolia Transportation Services, Inc.*

1

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC, and that on the 14th day of December, 2015, the foregoing **OPPOSITION OF THE BUS PLAINTIFFS TO THE UNITED STATES OF AMERICA'S MOTION TO DISMISS THIRD PARTY COMPLAINT** was served by e-service, in accordance with the Electronic Filing Procedures of the United States District Court:

Douglas F. Welebir, Esq.
Welebir Tierney & Weck
2068 Orange Tree Lane, Suite 215
Redlands, CA 92374

*Attorneys for Plaintiffs Michael Chestnut, Misiona Tusieseina and Pedro Miranda*

Loretta E. Lynch
Laura E. Duffy
Glen F. Dorgan
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, California 92101

*Attorneys for the Third-Party Defendant United States of America*

Kevin L. Elder, Esq.
Penney & Associates
6536 Lonestreet Blvd.
Rocklin, CA 95765

*Attorneys for Plaintiffs Jesus Aguilar, Naiomi Bridgette, Jermaine Ratliff*

John S. Williamson, Esq.
Williamson Law Group
Xerox Centre
1851 East 1st Street, Suite 1225
Santa Ana, CA 92705

*Attorneys for Steven Kilty and FBN Transportation, LLC*

Martin D. Gross, Esq.
Law Offices of Martin D. Gross
2001 Wilshire Boulevard, Suite 205
Santa Monica, CA 90403

*Attorneys for Plaintiffs Margaret Keiper and Dail Keiper, Jr.*

_____/s/ Jeremy R. Alberts_____
An employee of WEINBERG, WHEELER, HUDGINS GUNN & DIAL, LLC