UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 15-703 JGB (SPx)** | Date | June 4, 2021 |
|---|---|---|---|
| Title | *Margaret Keiper, et al. v. Victor Valley Transit Authority, et al.* | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) DENYING Bus Defendants' Partial Motion for Summary Judgment (Dkt. No. 383); (2) GRANTING-IN-PART and DENYING-IN-PART Defendant United States' Motion for Summary Judgment (Dkt. No. 384); and (3) VACATING the June 7, 2021 hearing. (IN CHAMBERS)

Before the Court are two motions for summary judgment: a partial motion for summary judgment filed by Defendants Victory Valley Transit Authority, Dinorah Aguilar, Transdev Services, Inc., and Veolia Transportation Services, Inc. (collectively, "Bus Defendants,") and a motion for summary judgment filed by Defendant United States. ("Bus Motion," Dkt. No. 383; "U.S. Motion," Dkt. No. 384.) The Court finds these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. Upon consideration of the papers filed in support of and in opposition to the Motions, the Court DENIES Bus Defendants' Motion, GRANTS-IN-PART and DENIES-IN-PART the United States' Motion, and VACATES the June 7, 2021 hearing.

## I. BACKGROUND

This case arises out of a collision between a bus and a tractor-trailer on June 2, 2014. (Dkt. No. 358.) The bus was owned by Victor Valley Transit Authority ("VVTA") and was operated by Dinorah Aguilar, an employee of Transdev Services, Inc. ("Transdev"), formerly known as Veolia Transportation Service, Inc. ("Veolia") (collectively, "Bus Defendants"). (See Dkt. No. 298.) The tractor-trailer was owned by Defendant FBN Transportation, LLC and

operated by Defendant Steven Kilty (collectively, "Trucking Defendants,"). (Dkt. Nos. 358-361.)

There were eight passengers aboard the bus at the time of the collision, and they or their surviving family members filed suit consolidated under the lead case Margaret Keiper, et al. v. Victor Valley Transit Authority, et al. (Dkt. No. 138.) All Plaintiffs allege causes of action against Bus Defendants, Trucking Defendants, and the United States. (Dkt. Nos. 358-361.)

From May 19, 2016 until January 17, 2019, this case was stayed pending the related criminal trial of Steven Kilty. (Dkt. Nos. 191, 219.)

On October 7, 2020, Plaintiffs filed Second Amended Complaints. (Dkt. Nos. 358-361.)

On March 29, 2021, Bus Defendants filed the Bus Motion along with the following documents:

- Statement of Undisputed Facts ("Bus DSUF," Dkt. No. 383-1);
- Declaration of Jeremy R. Alberts ("Alberts Declaration," Dkt. No. 383-2); and
- Exhibits 1-14 in support of the Alberts Declaration (Dkt. Nos. 383-4 – 383-17).

The same day, the United States filed the U.S. Motion with the following documents:

- Statement of Undisputed Facts ("U.S. DSUF," Dkt. No. 384-2);
- Declaration of Joshua Raheem ("Raheem Declaration," Dkt. No. 384-3); and
- Exhibits 1-24 in support of the Raheem Declaration (Dkt. No. 384-4).

On April 12, 2021, the Trucking Defendants opposed the U.S. Motion. ("Trucking Opposition," Dkt. No. 386.) In support of the Trucking Opposition, Trucking Defendants submitted the following documents:

- Declaration of Connie L. Benson ("Benson Declaration," Dkt. No. 386-1);
- Statement of Genuine Dispute of Material Facts and Additional Disputed Facts ("Trucking DSUF," Dkt. No. 386-2);
- Exhibits in support of the Benson Declaration (Dkt. Nos. 386-3 – 386-9).

The same day, Plaintiffs opposed the U.S. Motion. ("Opposition to U.S.," Dkt. No. 387.) In support of their Opposition to the United States, Plaintiffs also filed the following documents:

- Statement of Genuine Dispute of Material Facts and Additional Disputed Facts ("PSUF Reply to U.S.," Dkt. No. 387-1);
- Separate Statement of Additional Material Facts (Dkt. No. 387-2);
- Declaration of Robert W. Brannen ("Brannen Declaration," Dkt. No. 387-3); and
- Exhibits in support of the Brannen Declaration (Dkt. No. 387-4 – 387-25).

The same day, Bus Defendants opposed the U.S. Motion. ("Bus Opposition to U.S. Motion," Dkt. No. 388). In support of the Bus Opposition to the United States, Bus Defendants also filed the following documents:

- Declaration of Jeremy Alberts (Dkt. No. 388-1);
- Separate Statement of Genuine Disputes of Material Fact (Dkt. No. 388-2); and
- Exhibits 1-11 in support (Dkt. Nos. 388-3 – 388-13).

The same day, Plaintiffs opposed the Bus Motion. ("Opposition to Bus," Dkt. No. 389.) In support of their Opposition to Bus Defendants' Motion, Plaintiffs submitted the following documents:

- Statement of Genuine Dispute of Material Facts and Additional Disputed Facts ("PSUF Reply to Bus," Dkt. No. 389-1);
- Declaration of Stephanie Taft ("Taft Declaration," Dkt. No. 389-2); and
- Exhibits 1-17 to the Taft Declaration (Dkt. Nos. 389-3 – 389-19).

On April 19, 2021, Bus Defendants replied to Plaintiffs' Opposition to their Motion. ("Bus Reply," Dkt. No. 391.) Bus Defendants did not submit a statement of facts which replies to Plaintiffs' PSUF Reply to Bus; they instead included specific factual objections in the Bus Reply. (Id.) It is the Court's understanding that Bus Defendants dispute facts 6, 24, 25, 29, 39, 62, 63, 84, 85, and 88 in Plaintiffs' separate statement of undisputed facts. (Id. at 4.)

The same day, the United States replied to the oppositions to its Motion. ("U.S. Reply," Dkt. No. 392.) On April 20, 2021, the United States submitted the following documents in support of its Reply:

- Declaration of Valerie Torres ("Torres Declaration," Dkt. No. 393);
- Motion to Strike and Objections to Evidence ("Motion to Strike," 393-1);
- Reply to Statement of Additional Material Facts ("U.S. DSUF Reply" Dkt. No. 393-2);
- Reply to Statement of Disputed Material Facts (Dkt. No. 393-3); and
- Declaration of David Garcia ("Garcia Declaration," Dkt. No. 394).

On April 26, 2021, Plaintiffs opposed the United States' Motion to Strike. (Dkt. No. 398.) The same day, Bus Defendants also opposed the United States' Motion to Strike. (Dkt. No. 399.)

On April 30, the United States replied to the oppositions to its Motion to Strike. (Dkt. No. 403.)

//
//

## II.     FACTS

### A.   Undisputed Facts

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for purposes of the Motions. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

### 1. Bus Defendants' Undisputed Facts Regarding Veolia Personnel and Responsibilities

Early in the morning on June 2, 2014, Dinorah Aguilar was driving a passenger bus for Veolia on the bypass road to Fort Irwin. ("PSUF Reply to Bus," ¶ 1.) At approximately 5:06 a.m., the passenger bus collided with the left-hand side of the back of a semi-truck that was parked in the middle of the right lane with no lights on. (Id.) Dinorah Aguilar had been a bus operator for eight years with Veolia prior to the June 2, 2014 accident. (Id. ¶ 38.)

Veolia Transportation Services, Inc. was the bus operator for the Victor Valley Transit Authority service area at that time. (Id. ¶ 2.) Veolia Transportation Services, Inc. became Transdev Services, Inc. after the accident in 2014. (Id. ¶ 3.) At the time of the accident, Veolia Transportation Services Inc. was a Maryland corporation with its principal place of business in Lombard, Illinois. (Id. ¶ 4.) Veolia's principal place of business is where all corporate policy and administration was conducted for the company. (Id. ¶ 5.) At the time of the subject incident, Veolia operated more than 120 transportation contracts in various locations throughout the United States and Canada and employed more than 18,000 people. (Id. ¶ 7.)

During this litigation, Plaintiffs did not depose any employee from Veolia's corporate offices other than Matthew Weinberg, who was hired in 2017 as the Northwest regional safety manager. (Id. ¶ 9.) During discovery, Veolia's officers and directors were identified as follows: Veolia's Regional Vice President for Southern California was Duane Eskierka; Veolia's Regional Safety Director was Jacob Ortiz; Veolia's Regional Human Resource Director was Kathy Snow; Veolia's Regional Maintenance Director was Fermin Mora; Veolia's Environmental Project Manager was Craig Bilderback; Veolia's Director of Business Improvement was Chris Bryan; and Veolia's Board of Directors included Mark Joseph, Jan Horstmann, and Alan Moldawer. (Id. ¶ 10.) Employees of Veolia employed on June 2, 2014 that have been deposed in these consolidated matters include Dinorah Aguilar, Ericka Hill, Mable Manuel, Craig Barnes, Josefita Zambrano, Sue Crane, and Simon Herrera. (Id. ¶ 11.)

Ericka Hill was a bus driver for Veolia that drove the Fort Irwin route—where the crash occurred—prior to the accident. (Id. ¶ 13.) Mable Manuel was also a bus driver for Veolia who drove the Fort Irwin route. (Id. ¶¶ 28-29.)

Craig Barnes worked for Veolia at the time of the accident. (Id. ¶ 15.) He began working for Veolia in 2008 as an electronics technician, and in 2011, he became the Operations Supervisor

that created route directions for operators, including notices of detours.  (Id. ¶¶ 16-17.)  Craig Barnes did not receive any operator training from Veolia; his job was to propose changes to routes and schedules.  (Id. ¶¶ 18-19.)  He had no authority to adopt a proposed schedule or route and was not involved in the selection of the bus for any given route.  (Id. ¶¶ 20-21.)  Craig Barnes was not involved in providing instruction on speed limits to drivers for Veolia, and he had no supervisory role over bus operators while working at Veolia.  (Id. ¶¶ 26-27.)

Josefita Zambrano was hired as a dispatcher/supervisor for Veolia in 2006.  (Id. ¶ 30.)  She was the head dispatcher and ensured routes were covered by drivers in the two years prior to the accident.  (Id. ¶ 31.)  Josefita Zambrano had no knowledge that Dinorah Aguilar was a diabetic or had been prescribed insulin prior to the accident.  (Id. ¶ 33.)  During this litigation, Ms. Zambrano testified that in her view, Dinorah Aguilar was a great driver.  (Id. ¶ 35.)  Ms. Zambrano does not recall handling any investigation into a complaint involving Dinorah Aguilar or talking to any passengers who complained about Ms. Aguilar.  (Id. ¶ 37.)

Matthew Weinberg worked for Veolia in various positions from 2007 through 2013 and began working for Transdev in 2017.  (Id. ¶ 40.)  Mr. Weinberg is now the regional safety manager for Transdev for the New York region.  (Id. ¶ 41.)  He does not know who the regional safety director was for the Southwest region at the time of the accident.  (Id. ¶ 42.)  Mr. Weinberg testified that the regional safety director for Veolia would be responsible for spot checking bus operator personnel files to ensure licensing.  (Id. ¶ 43.)  He reviewed Dinorah Aguilar's training file in advance of his deposition and confirmed that she participated in the New Operator training module.  (Id. ¶ 44.)  Mr. Weinberg testified that in his understanding, with respect to the medical fitness of a driver, a D.O.T. medical certification would satisfy that requirement.  (Id. ¶ 45.)  Matthew Weinberg testified that a trail check was performed for Dinorah Aguilar for each year she was employed in accordance with company policy.  (Id. ¶ 46.)

Susan Crane was a safety training manager who worked for Veolia from the 1990s through 2018.  (Id. ¶¶ 48-49.)  As a safety manager, Susan Crane was responsible with her team for hiring, teaching classes, behind the wheel training, safety meetings, and anything to do with safety.  (Id. ¶ 50.)  Ms. Crane was responsible for overseeing that Dinorah Aguilar received training when she was hired in 2006 and again in 2011 or 2012.  (Id. ¶ 57.)  Susan Crane has no recollection of seeing any injury complaints against Dinorah Aguilar.  (Id. ¶ 62.)  Ms. Crane received a copy of medical reports for Dinorah Aguilar that predated the June 2, 2014 accident that cleared Ms. Aguilar to drive even though she had diabetes.  (Id. ¶ 66.)  Susan Crane was not aware of any problem with the bike rack blocking the low beam headlight on the bus.  (Id. ¶ 71.)  Drivers did not complain about the bike racks blocking the low beam headlight.  (Id. ¶ 72.)

Simon Herrera was the on-site general manager for Transdev for the accident location from 2007 through 2017.  (Id. ¶ 75.)  Mr. Herrera was not aware of any problem with the bike rack obstructing the headlights at the time of the accident.  (Id. ¶ 81.)  Mr. Herrera's oversight was limited to the VVTA location, which includes the site of the accident.  (Id. ¶ 83.)  At the time of the accident, Mr. Herrera was unaware that Dinorah Aguilar was not licensed to operate a 40-foot bus.  (Id. ¶ 84.)  Simon Herrera was not involved in any driver training in connection with

the use of the bypass road to Fort Irwin. (Id. ¶ 86.) Prior to the subject accident, Simon Herrera did not receive any notice from the Investigation Team questioning Ms. Aguilar's ability to operate a bus. (Id. ¶ 94.)

VVTA makes the decision whether a driver is at fault for a particular complaint. (Id. ¶ 90.) Had there been concern about Dinorah Aguilar's fitness to drive, the safety manager would have reached out to Simon Herrera or the Veolia corporate office safety director. (Id. ¶ 105.)

### 2. Plaintiffs' Undisputed Facts Regarding Veolia Personnel and Responsibilities

As discussed above, it is the Court's understanding that Bus Defendants dispute facts 6, 24, 25, 29, 39, 62, 63, 84, 85, and 88 in Plaintiffs' separate statement of undisputed facts. (Bus Reply 4.) However, in a footnote, Bus Defendants also argue that they dispute Plaintiffs' entire separate statement of undisputed facts. (Id. at 4 n.2.) Without written objections to each submitted fact, the Court will not credit these disputes.

At the time of the collision, Defendant Aguilar was an employee of Defendant Veolia. (PSUF Reply to Bus ¶ 1.)[1] The parties have stipulated that the actions of Defendant Aguilar determined to be within the course and scope of her employment with Veolia become the responsibility of Transdev. (Id. ¶ 2.)

At the time of the accident, mass transportation system operator Victor Valley Transit Authority ("VVTA") had a contract with Veolia Transdev to provide operations across the "High Desert Region," which includes the site of the accident. (Id. ¶ 4.) Part of the contract included an on-site management structure with key personnel, including a General Manager, an Assistant General Manager, a Safety and Training Manager, a Maintenance Manager, and other senior staff. (Id. ¶¶ 7-8.) Simon Herrera, Susan Crane, and Ron Zirges held local management positions with Veolia; they were on the "Management Team." (Id. ¶¶ 10-11.)

During the course of this litigation, Plaintiffs deposed corporate representative Matthew Weinberg, Transdev's Rule 30(b)(6) witness, who was not employed by Veolia/Transdev at the time of the accident, but is currently employed by Transdev North America, Inc., the umbrella corporation for Defendant Transdev. (Id. ¶¶ 13-16.) The safety programs used by Transdev today are the same as those utilized by Veolia in 2014. (Id. ¶ 17.)

The Management Team of the High Desert Region had discretion when and where to perform Trial Checks of its operators and what factors constituted accident preventability. (Id. ¶¶ 26-27.) They were also authorized to investigate situations that involved any unsafe act, practice, or behavior. (Id. ¶ 28.) Veolia's High Desert Region Management Team adopted a policy specific to it where all complaints concerning unsafe operating would need to be reviewed

---

[1] Plaintiffs' Separate Statement of Undisputed Facts begins again at No. 1 instead of continuing in number after Bus Defendants' undisputed facts. For the purposes of this section, "PSUF Reply to Bus" begins on p. 54 of Dkt. No. 389-1.

by the Safety and Training Manager, Susan Crane. (Id. ¶ 30.) Veolia's High Desert Region Management Team also adopted a policy where all bus operators newly assigned to the Fort Irwin routes needed to receive at least 30 hours of New Operator route training before beginning to transport passengers on that route. (Id. ¶ 31.)

Susan Crane was responsible for overseeing all safety and training programs, overseeing all new hire and refresher training for Bus Operators, coordinating with corporate risk management, overseeing all emergency management and all bus safety management plans, reviewing all safety-related complaints, determining whether any Bus Operators were suffering from a safety-related health condition, and more. (Id. ¶ 32.) Ms. Crane testified she believed it was possible that she oversaw upwards of 50 bus operators at any one time. (Id. ¶ 33.) She was responsible for establishing the Safety Committee for the High Desert Region and sat as its chair; she also had the discretion to receive additional and/or remedial training. (Id. ¶¶ 34-35.) Ms. Crane was responsible for handling all complaints that involved any risk of injury. (Id. ¶ 38.)

Simon Herrera started his career with Veolia Transportation in 2004 as the Assistant General Manager. (Id. ¶ 43.) In 2007, Mr. Herrera was promoted to General Manager for the High Desert Region; he continued in that position through the date of the accident. (Id. ¶ 44.) His primary responsibilities in that position included establishing operating procedures and policies. (Id. ¶ 47.) It was Mr. Herrera's duty to oversee performance of operations, including safety, quality, and adherence to governmental regulations. (Id. ¶ 50.) If an allegation was made against a bus operator that concerned unsafe or reckless driving, Simon Herrera reviewed the complaint together with Sue Crane. (Id. ¶ 53.) Mr. Herrera was one of the few people within Veolia's High Desert Region Management Team (along with Brent Johnson and Sue Crane) who had the authority to actually review a bus's black box's contents to confirm whether a bus operator was driving in an unsafe or reckless manner. (Id. ¶ 54.)

Brent Johnson began working as a Road Supervisor for Veolia in 2010. (Id. ¶ 55.) In or around 2012, Mr. Johnson assumed the title of Operations Supervisor/Manager with Veolia, which he kept for two more years. (Id. ¶ 56.) As Operations Supervisor/Manager, Brent Johnson was responsible for investigating and responding to passenger complaints and accidents. "Everyone" reported to Mr. Johnson, who could hire or fire bus operators; Mr. Johnson reported to Mr. Herrera. (Id. ¶¶ 58-60.) In October 2013, there were two complaints made about Dinorah Aguilar's driving. (Id. ¶ 77.) Brent Johnson reviewed those complaints internally. (Id. ¶ 78.) Veolia's managers classified the complaints as being unsafe operating and/or reckless driving. (Id. ¶ 79.)

In and before 2014, all complaints about unsafe operating and/or reckless driving warranted having the bus's black box video pulled and reviewed by Simon Herrera. (Id. ¶ 80.) Per Veolia's operational policies, complaints about unsafe operating in the High Desert Region would have been reviewed by Susan Crane and Simon Herrera. (Id. ¶ 81.) When a complaint was referred to Ms. Crane, it was noted in the TransTrack system, where Veolia and VVTA maintained and responded to passenger complaints. (Id. ¶ 82.)

Ms. Crane knew as far back as 2006 that Defendant Aguilar had Restriction 76 on her driver's license: a restriction that prevented her from operating buses weighing over 26,001 lbs. (Id. ¶ 92.) Ms. Crane was specially trained to certify that the Bus Operators could legally operate the buses that they were assigned to drive. (Id. ¶ 93.) On the day of the accident, Veolia assigned Ms. Aguilar to drive a bus weighing over 40,600 pounds—over 14,000 pounds heavier than the legal weight restriction on Ms. Aguilar's Commercial Driver's License. (Id. ¶ 94.)

Bus operators with Veolia were typically given at least 30 hours of new route training prior to beginning to drive an unfamiliar route, to be documented in the operator's training file. (Id. ¶ 95.) The only training Defendant Aguilar received before operating on the route was with Craig Barnes, who was not a trainer and who provided no instruction to Aguilar. (Id. ¶ 96.) Defendant Aguilar said she was instructed to not use high beams on the roads leading into Fort Irwin. (Id. ¶ 97.) During her entire tenure with Veolia, Aguilar never received supervised behind-the-wheel training at night or during early morning hours. (Id. ¶ 98.)

### 3. The United States' Undisputed Facts

At 5:06 a.m. on June 2, 2014, Defendant Dinorah Aguilar was driving a bus north in the #2 (righthand) lane on the Fort Irwin Bypass Road ("Bypass Road") when the bus collided with the rear of a tractor trailer parked in the #2 lane of the Bypass Road. (PSUF Reply to U.S. ¶ 1.) Fort Irwin National Training Center ("Fort Irwin") is the main training area for the United States military. (Id. ¶ 2.) On a daily basis, the population of Fort Irwin is approximately 25,000 people, including active duty soldiers, family members, and civilian employees. (Id. ¶ 4.) Fort Irwin's mission is to provide realistic combat training for "brigade combat teams" of 5,500 to 6,000 troops. (Id. ¶ 5.) The base is designed with one main gate, located on Fort Irwin road ("Main Gate"). (Id. ¶ 6.)

Though the parties dispute whether the Bypass Road is "on" or "within the property boundaries" of the base, it is undisputed that it is a two-lane northbound roadway which leads to the Main Gate and provides access to the base. (Id. ¶ 11.) The Bypass Road diverges from Fort Irwin Road, runs for 3.9 miles parallel to Fort Irwin Road, and merges back onto Fort Irwin Road south of the Main Gate. (Id. ¶ 12.)

At all times relevant here, Fort Irwin operated a temporary security checkpoint between 6:00 a.m. and 8:00 a.m. on weekdays for commercial trucks at the mid-point of the Bypass Road. (Id. ¶ 15.) The purposes of the temporary security checkpoint were to: (1) alleviate congestion at the Main Gate; (2) ensure that individuals reporting for work or duty on the base arrived on time; and (3) move the process for inspecting and clearing commercial traffic to a location that was a safe distance from the Main Gate, where security risks associated with the inspection process are heightened. (Id. ¶ 16.)

At all times relevant here, there was a traffic sign on the right shoulder of Fort Irwin Road prior to the beginning of the Bypass Road. (Id. ¶ 17.) The sign directed "passenger cars and all

pickups" with an arrow pointing straight or forward and indicated a "truck bypass" with an arrow pointing to the right.  (Id.)

At all times relevant here, there was also a traffic sign labeled "Check-in Point" on the right shoulder of the Bypass Road about 2.6 miles north of where the Bypass Road diverges from Fort Irwin Road.  (Id. ¶ 18.)  This location also featured a barricade labeled "Trucks Stop Here Hours: 0600-0800 Monday-Friday Main Gate: 760-380-2255".  (Id. ¶ 19.)  The United States' customary process for operating the temporary security checkpoint at the mid-point of the Bypass Road would customarily begin at around 6:00 a.m. with one or two guards traveling from the Main Gate to the Checkpoint.  (Id. ¶ 20.)  Upon arriving at the checkpoint on or around 6:00 a.m. on weekdays, the one to two guards would customarily move the barricade sign from the shoulder into the right lane of the Bypass Road to stop commercial trucks in the right lane.  (Id. ¶ 21.)[2]  After directing the first commercial truck to stop at the barricade sign, the one to two guards would customarily return to the Main Gate to resume their regular job responsibilities.  (Id. ¶ 22.)  After doing this, the one to two guards would return to the checkpoint at or around 7:30 a.m. and customarily commence inspecting the commercial trucks.  (Id. ¶¶ 23-24.)

The collision occurred roughly 2.6 miles north of the point where the Bypass Road diverges from Fort Irwin Road.  (Id. ¶ 31.)  Defendant Kilty arrived at the Bypass Road the day prior to the accident, Sunday, June 1, 2014, at approximately 9:00 p.m.  (Id. ¶ 32.)  Defendant Kilty had one prior experience with the Bypass Road, having traveled on it between the hours of 6:00 a.m. and 7:00 a.m. on Wednesday, January 29, 2014.  (Id. ¶ 33.)

On June 1, 2014, Defendant Kilty merged onto the Bypass Road and stopped his tractor-trailer in the right lane when he observed the barricade sign.  (Id. ¶ 39.)  Once he stopped his tractor-trailer, Defendant Kilty exited the cab and observed the "Check-in Point" sign for the first time.  (Id. ¶ 40.)

Defendant Aguilar began driving bus routes to Fort Irwin in approximately October 2013.  (Id. ¶ 42.)  She drove the same bus route, called "Route 101," every weekday.  (Id. ¶ 43.)  When driving Route 101, Ms. Aguilar would customarily arrive with passengers at the Bypass Road around 5:00 a.m.  (Id. ¶ 44.)  Ms. Aguilar did not recall ever observing trucks stopped on the Bypass Road during her regular route.  (Id. ¶ 45.)

On June 2, 2014, Plaintiff Ariel Derosier was an Active-Duty Army Specialist (E4).  (Id. ¶ 48.)  At the time of the accident, Ms. Derosier was traveling to report to her unit for physical training ("PT") duty near Weed Army Hospital.  (Id. ¶ 49.)  Ms. Derosier sustained a knee injury, concussion, PTSD, depression, anxiety, and sleeplessness as a result of the accident.  (Id.

---

[2] No party disputes that it was the custom of the United States to do this.  However, Trucking Defendants claim the barricade sign "had been inadvertently left in the right lane of travel on the day of the incident[.]"  (Trucking DSUF ¶ 21.)  Plaintiffs claim the barricade sign "was not in the right lane of travel on the Bypass Road when Kilty stopped his truck."  (PSUF Reply to U.S. ¶ 21.)

¶ 52.) She received treatment for her injuries through either the Army or the Veterans' Administration ("VA") in Nashville, Tennessee and Clarksville, Tennessee. (Id. ¶ 53.) Ms. Derosier did not receive any medical treatment for injuries sustained in the accident outside of the Army or VA. (Id. ¶ 54.) She never received a medical bill for any of the treatment provided by the Army of the VA. (Id. ¶ 55.) The VA found that the injuries Ms. Derosier incurred in the accident were service-connected. (Id. ¶ 56.) She applied for VA disability benefits for the injuries she sustained in the accident, and she now receives service-connected disability compensation on a monthly basis. (Id. ¶¶ 57-58.) Ms. Derosier's disability rating entitles her to free access to VA medical care for the rest of her life. (Id. ¶ 59.)

On June 2, 2014, Plaintiff Pedro Martinez Miranda was an Active-Duty Army Specialist (E4) assigned to Fort Irwin. (Id. ¶ 60.) The day of the accident, Mr. Miranda was assigned to the Maintenance Troop at the Maintenance Building as a generator mechanic. (Id. ¶ 61.) Mr. Miranda was on the bus the day of the accident for the purpose of reporting for duty on Fort Irwin. (Id. ¶ 62.) At the time of the accident, he was dressed in his PT uniform. (Id. ¶ 64.) As a result of the accident, Mr. Miranda suffered a left pelvic fracture and left hip pain, nerve injury, open wounds, and emotional distress, among other injuries. (Id. ¶ 66.) He received care for his injuries at Weed Army Community Hospital, Loma Linda University Medical Center, and Chaparral Physical Therapy. (Id. ¶ 67.) When Mr. Miranda was an Active Duty servicemember in the Army, TRICARE paid for all his medical bills, including those expenses associated with the care he received at Loma Linda and Chaparral for his injuries. (Id. ¶ 68.) He had no co-pays or out-of-pocket payments for the care covered through TRICARE. (Id. ¶ 69.) The VA has covered all of Mr. Miranda's medical expenses since he left the army. (Id. ¶¶ 70-71.) Mr. Miranda received a disability rating from the Army which entitles him to monthly disability benefits. (Id. ¶ 73.)

### 4. Plaintiffs' Undisputed Facts Regarding the United States' Facts

The main Fort Irwin Road and the Bypass Road are traveled by military personnel and civilians alike. (U.S. DSUF Reply ¶ 3.) No permits or passes are required to drive on the Fort Irwin Road or the Bypass Road until reaching the Fort Irwin Main Gate. (Id. ¶ 4.) The Bypass Road was built, maintained, and controlled by Fort Irwin. (Id. ¶ 5.) Both Plaintiffs Derosier and Miranda were riding a public bus on their way to work at the time of the incident with six other civilian passengers. (Id. ¶ 6.) Plaintiff Derosier was off duty at the time of the incident; her time to report for duty was 5:45 a.m. (Id. ¶ 9.) Plaintiff Miranda was off duty at the time of the incident; his time to report for duty was 6:30 a.m. (Id. ¶ 10.)

### 5. Bus Defendants' Undisputed Facts Regarding the United States' Facts

At the time of the accident, Defendant Kilty's semi-truck was parked with no lights on, and no warning triangles or flares placed in the road to warn other drivers of its presence. (U.S. DSUF Reply p. 4 ¶ 2.) The night prior to the accident, Mr. Kilty had parked next to the inactive "checkpoint" on the bypass road. (Id. ¶ 4.) After arriving, Mr. Kilty turned off his truck

(including all of the exterior and interior lights), crawled into the Sleeper Berth and fell asleep. (Id. ¶ 5.)

### 6. Trucking Defendants' Undisputed Facts Regarding the United States' Facts

At or around 4:00-4:15 a.m., an unidentified truck driver driving in the right lane drove past Mr. Kilty's stopped truck. (Id. at 14 ¶ 2.) Once the truck driver arrived at the Fort Irwin main gate, he reported driving past Mr. Kilty's vehicle, which had no lights on, to James Hijoe, a Fort Irwin gate guard. (Id. ¶ 3.) Mr. Hijoe testified he decided to do nothing with this information because it was his practice to respond to hazard reports only after "two, three more reports of the same type of vehicle." (Id. ¶ 4.)

### 7. Facts Related to the MUTCD and the Motion to Strike

The following facts are disputed in the United States' Motion to Strike because they cite to a 2015 declaration of David Royer:

Fort Irwin's engineer, Sabah Issa, testified that at the time of the accident, the Manual on Uniform Traffic Control Devices ("MUTCD") provided mandatory requirements for traffic control, that the signage and checkpoint on the bypass road violated several mandatory requirements of the MUTCD, and that the signage on the bypass road was "confusing." (U.S. DSUF Reply ¶ 13.) On June 2, 2014, the Fort Irwin Bypass Road's traffic control devices did not comply with MUTCD Sections 6B.01; 26.06; 2G.03; or Section 6F.22 01. (Id. ¶ 19.)

The United States moves to strike or otherwise exclude the testimony of David Royer as contained in his declaration, dated and signed December 14, 2015 and relied upon by Plaintiffs, Bus Defendants, and Trucking Defendants in opposing the United States' Motion for Summary Judgment. (See "2015 Royer Declaration," Dkt. Nos. 386-1, 387-24, 388-11.) The United States argues there are discrepancies between the 2015 Royer Declaration and a later-written Rule 26 Report also authored by Mr. Royer ("Royer Rule 26 Report," Dkt. No. 384-4 Exh. 20). (Motion to Strike.) The United States also seeks to strike Mr. Royer's report and opinions on the grounds that he is an improper expert because he was disclosed by Trucking Defendants but is being used by Plaintiffs and Bus Defendants as well. (Id.)

The Court finds the two paragraphs of the 2015 Royer Declaration referenced above consistent with Mr. Royer's later-authored report. The conclusion of Royer Rule 26 Report reads: "Had Fort Erwin [sic] followed the pre-engineered Standards and Guidance of the MUTCD, the subject collision should not have occurred; nor, would the high potential for a rear end collision during truck inspection times be present." (Royer Rule 26 Report.) He also opines that military command roadways are required to comply with MUTCD, and because Fort Irwin is within California, its own internal guidelines call for compliance with California's MUTCD. (Id.) Though there are discrepancies between the two Royer documents, they are not relevant to the ultimate facts proffered: that the MUTCD required traffic guidance the United States did not have.

Further, it is not improper for parties to rely on other parties' experts' opinions on summary judgment. The United States' motion to strike is DENIED as to the facts above and such facts are considered for the purpose of these Motions. To the extent the motion to strike opposes the inclusion of facts not included, it is DENIED AS MOOT.

**B.  Evidentiary Objections**

Because the Court does not consider any objected to evidence which has not already been discussed, all evidentiary objections are DENIED as moot.

### III.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325. Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle, 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

//
//
//

## IV.  DISCUSSION

### A.  The Bus Motion

On September 30, 2020, the Court granted Plaintiffs' consolidated motion to amend their Complaints to include pleas for punitive damages.  (Dkt. No. 356.)  The Court summarized Plaintiffs' motion for leave to amend as follows:

> Plaintiffs are seeking to amend their Complaints because in the course of discovery, which began in earnest in 2019, they received information which led them to believe that at the time of the collision: Defendant Aguilar suffered from untreated diabetes which sometimes caused her vision to blur; Defendant Aguilar was not licensed to drive the bus she was driving at the time of the collision; Defendant Aguilar was instructed by her employer Defendant Transdev not to use her high beam headlights while driving at night; and there was a bike rack installed on the front of the bus which partially obstructed its headlights.

Id. at 3.  In addition to the above, Plaintiffs' claims for punitive damages also include allegations that:

> 1) the bus route from Barstow to Fort Irwin in the early morning hours was the most dangerous bus route for Bus Operators, including Defendant Aguilar; 2) multiple passengers had complained about Defendant Aguilar's operation of the bus prior to the Subject Incident with some questioning whether she suffered from "night blindness" and those complaints were not investigated; 3) no Supervisor conducted an on-board Operator Evaluation or a Trail Check, or any additional driver's supervision of Defendant Aguilar and no additional training was provided to Defendant Aguilar in response to the complaints; 4) Defendant Aguilar was medically unqualified to drive; 5) Defendant Aguilar was not trained on the Fort Irwin route; and 6) Defendant Aguilar was not trained/ supervised to drive the Fort Irwin route at night despite being assigned that nighttime route.

Opposition to Bus 3-4.  These facts are not undisputed for the purposes of this Motion, but they generally encapsulate Plaintiffs' punitive damage claims.

Bus Defendants argue that Plaintiffs do not meet the standard for punitive damages against corporate employers, and thus seek summary judgment on the punitive damages claims.  (Bus Motion 17.)  Under California law, an employer is not liable for punitive damages for the acts of its employee unless: (1) "the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others"; (2) the employer "authorized or ratified the wrongful conduct"; or (3) the employer "was personally guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294(b).  For claims of punitive damages arising from advance knowledge or ratification, such knowledge or ratification "must be on the part of an officer, director, or managing agent of the corporation."  Id.  Bus

Defendants argue that no officer, director, or managing agent of Veolia had advance knowledge of Defendant Aguilar's alleged unfitness as a driver or of any issues with lighting on the busses, and further, that Plaintiffs have no evidence to indicate otherwise. (Bus Motion 23.)

At core, Bus Defendants' Motion may be boiled down to two questions: First, whether Brent Johnson, Susan Crane and/or Simon Herrera were officers, directors, or managing agents of Veolia at the time of the accident; and secondly, whether anyone at Veolia—including the Johnson, Crane, and/or Herrera—employed Dinorah Aguilar "with a conscious disregard of the rights or safety of others."

A reasonable jury could find that individuals at Veolia employed Ms. Aguilar in conscious disregard of the safety of others. Ms. Crane knew as far back as 2006 that Ms. Aguilar was not licensed to operate a bus weighing more than 26,000 pounds, but on the date of the accident, Veolia assigned Ms. Aguilar to drive a bus weighing over 40,600 pounds. (PSUF Reply to Bus ¶¶ 92-94.) Veolia's choice to assign Ms. Aguilar to a bus larger than she was licensed to drive despite actual knowledge that she was not licensed to drive such a bus is enough to raise a triable issue. Likewise, Brent Johnson reviewed complaints of reckless driving lodged against Ms. Aguilar before the accident, but nothing was changed about Ms. Aguilar's training, assignments, or responsibilities in the wake of such complaints. (Id. ¶¶ 77-79.) If procedures outlined by Veolia were followed, both Simon Herrera and Susan Crane would have also had knowledge of complaints against Ms. Aguilar's driving. (Id. ¶¶ 80-81.) Even in the absence of other facts, these decisions—occurring above Ms. Aguilar on the corporate hierarchy—create issues of fact as to disregard of safety and ratification.

Whether individuals with knowledge of danger, i.e., Johnson, Crane, and/or Herrera, were officers, directors, or managing agents of Veolia for the purposes of punitive damages is a closer question. As Bus Defendants identify, the standard for such an inquiry is not mere job title, but whether an agent of a corporate employer "exercise[s] substantial discretionary authority over decisions that ultimately determine corporate policy." White v. Ultramar, Inc., 21 Cal. 4th 563, 577 (1999).

In Roby v. McKesson Corp., 47 Cal. 4th 686 (2009), the California Supreme Court held that the senior managers at McKesson Corporation did not qualify as the type of officers, directors, or managing agents whose actions could warrant punitive damages against a corporate employer. In reaching this conclusion, the court noted that McKesson had over 20,000 employees, and the manager in question supervised only four of them. 47 Cal. 4th at 714. The court clarified that the "discretionary authority" standard in White refers to "formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." Id. at 715. Such discretionary authority does not necessarily come from executives; the McKesson court also observed that mid-level managers could meet that standard. Id. ("McKesson does not argue that the midlevel managers at this meeting were not 'managing agent[s]' for purposes of awarding punitive damages . . . and therefore we will assume for purposes of this appeal that at least one of them was a managing agent.")

Veolia employed approximately 18,000 people at the time of the accident, so it appears undisputed that if punitive damages are to be imposed on Veolia, this liability will come from a mid-level manager on the Management Team of the High Desert Region and not from a corporate officer with decision-making authority over all employees. Simon Herrera, Susan Crane, and Ron Zirges were on the "Management Team" for the High Desert Region. (PSUF Reply to Bus p. 54 ¶¶ 10-11.) Members of that group were entitled to—indeed responsible for—reviewing safety complaints against drivers, reviewing black box video, hiring and firing drivers, assigning busses to drivers, and setting policy such as the policy where all bus operators newly assigned to the Fort Irwin routes needed to receive at least 30 hours of New Operator route training before beginning to transport passengers on that route. (Id. ¶ 31.) A reasonable jury could find that the Management Team of the High Region had policymaking authority sufficient to expose Veolia to liability for punitive damages. The Bus Motion is DENIED.

### B. The U.S. Motion

The United States is immune from suit except where it has consented to be sued. United States v. Mitchell, 455 U.S. 535, 538 (1980). The Federal Tort Claims Act (FCTA) waives the United States' sovereign immunity in some suits involving tort claims. See 28 U.S.C. § 2674. The United States moves for summary judgment on four grounds: (1) the Feres doctrine, Feres v. United States, 340 U.S. 135 (1950), bars recovery for Plaintiffs Derosier and Miranda; (2) the FTCA's discretionary function exemption bars claims based on the operation of the temporary security checkpoint and a security guard's decision not to investigate Mr. Kilty's parked truck; (3) no legal duty exists requiring security guards to investigate parked trucks; and (4) lack of causation. (U.S. Motion.)

#### 1. The Feres Doctrine

The United States' first argument is that the Feres doctrine bars recovery for Plaintiffs Derosier and Miranda, who were active duty service members at the time of the accident. (U.S. Motion 8.) That doctrine states that the FCTA's waiver of the United States' sovereign immunity does not extend to "injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." Feres, 340 U.S. at 146. In the Ninth Circuit, the factors which determine whether the Feres doctrine applies are: "(1) the place where the negligent act occurred, (2) the duty status of the plaintiff when the negligent act occurred, (3) the benefits accruing to the plaintiff because of the plaintiff's status as a service member, and (4) the nature of the plaintiff's activities at the time the negligent act occurred." Daniel v. United States, 889 F.3d 978, 981 (9th Cir. 2018). No factor is dispositive, and courts must consider the totality of the circumstances in making a determination.

Prongs two and three of the Ninth Circuit standard—duty status and benefits accrued—strongly support the United States. At the time of the accident, Plaintiffs Derosier and Miranda were active duty members of the military; they have since received medical care through the Army and the VA. Neither has been billed for the medical care they received. Prongs one and four go the other way. At the time of the accident, Plaintiffs Derosier and Miranda had not yet

"clocked in" or reported for duty; they were not yet past the Main Gate of Fort Irwin. They were on a road which required no permits or passes and was regularly travelled by military personnel and civilians alike. (U.S. DSUF Reply ¶¶ 1-6.) Most strikingly, at the time of the accident, Plaintiffs Derosier and Miranda were, like their civilian co-passengers, commuters on a public bus on their way to work. Though all bus passengers were injured differently in the crash, the accident itself did not discriminate between military personnel and civilians. It would be perverse for recovery to do otherwise.

Geiger v. United States, No. 04-540 2006 U.S. Dist. LEXIS 106061, *8 (C.D. Cal. Mar. 28, 2006) (aff'd 226 Fed. Appx. 688 (9th Cir. 2008)) is not to the contrary. Geiger involved a car accident on Fort Irwin Road in which Mr. Geiger's car was struck by an Army truck driven by Army personnel. The subsequent investigation delved into questions such as the training and supervision of the Army driver. That the collision involved members of the armed forces on both sides would have disturbed the U.S. military's disciplinary system and the "distinctively federal nature" of the relationship between servicemembers and the government. See Costo v. United States, 248 F.3d 863, 866 (9th Cir. 2001). Such considerations are not present here.

2. **The Discretionary Function Exception**

The United States' second argument is that its conduct falls within the discretionary function exception to the FTCA's waiver of sovereign immunity. (U.S. Motion 15.) That provision exempts the government from liability for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). In assessing whether governmental conduct is discretionary, "it is the nature of the conduct, rather than the status of the actor, that governs[.]" United States v. Varig Airlines, 467 U.S. 797, 813 (1984). If it is found that "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" and the employee has disregarded such policy, the discretionary function exception does not apply. See United States v. Gaubert, 499 U.S. 315, 322 (1991). In addition, "assuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." Berkovitz by Berkovitz v. United States, 486 U.S. 531, 536 (1988). Negligence is irrelevant to these inquiries. Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1029 (9th Cir. 1989).

This is not the first time the United States has raised discretionary function arguments. On February 1, 2016, the Court denied a motion to dismiss for lack of jurisdiction brought by the United States on those grounds. (Dkt. No. 155.) In that Order, the Court held that while implementation of the road safety elements required by the Manual on Uniform Traffic Control Devices ("MUTCD") was discretionary, the implementation of safety elements and maintenance was not activity susceptible to policy analysis that would shield the United States from tort liability. (Id. at 19-20). The Order specifically addressed claims that the United States was negligent by failing to: "(1) install longitudinal 'Bus Only' markings along the left lane of the bypass road; (2) cover temporary road signs when they were not in use; (3) post the checkpoint's

operational hours; and (4) post 'open' and 'closed' signs at the checkpoint." (Id. at 16-17 (internal citations omitted)).

Morales v. United States does not change the Court's analysis regarding traffic design and signage claims. 895 F.3d 708, 715 (9th Cir. 2018). Though that case rejected the suggestion, articulated in the February 1, 2016 Order, that the government cannot invoke the discretionary function exception when a decision involves considerations of public safety, it did not change the basic principles of the discretionary function exemption or the analysis the Court conducted in 2016. Road safety elements required by MUTCD are not statutes, but they are policy which specifically prescribes a course of action for an employee to follow, and further, the United States' justifications for deviating from the MUTCD are not the kinds of policy decisions which are grounded in social, economic, and political concerns sufficient to meet the exemption.

The United States also moves for summary judgment on discretionary function exemption grounds on Plaintiffs' new claims that the United States was negligent based on a decision by a Main Gate security guard, Mr. Hijoe, not to investigate or otherwise respond to a report of a truck parked on the Bypass Road. (See Dkt. Nos. 303 ¶ 47; 358 ¶ 35K; 359 ¶ 38j; 360 ¶ 38j; 361 ¶ 41k.) Unlike Plaintiffs' claims related to road safety regulations, there are no relevant suggested policy guidelines for main gate security guards. And though Mr. Hijoe's decision not to act may carry a heavier moral weight than the United States' deviation from generally-accepted road safety guidelines, Mr. Hijoe's behavior as a security guard falls under the umbrella of what the discretionary function exception seeks to protect. Just as prison officials have discretion as to how to respond to reported threats, military gate guards have discretion as to how to respond to potential hazards in the course of their duties. See Alfrey v. United States, 276 F.3d 557, 564 (9th Cir. 2002); see also Prelvitz v. Milsop, 831 F.2d 806, 810 (8th Cir. 1987) (decision whether to attempt to detain driver or further investigate drunk driving is discretionary); Attallah v. United States, 955 F.2d 776, 782-84 (1st Cir. 1992) (customs agent's decision not to search certain individuals was protected by the discretionary function exception). The U.S. Motion is GRANTED with respect to the claim that Mr. Hijoe's decision not to respond to reports of Defendant Kilty's truck obstructing a lane of traffic falls within the discretionary function exception to the FTCA.

### 3. Duty and Causation

The United States' third and fourth arguments for summary judgment are that the tort law elements of Plaintiffs' claims based on Mr. Hijoe's conduct fail for lack of duty and causation. (Motion 31, 35.) Specifically, it claims that no legal duty exists which would require Mr. Hijoe to respond to reports that Mr. Kilty's truck was parked with its lights off on the road, and additionally, theories which extend liability from Mr. Hijoe's actions lack causation. (U.S. Motion 33-37.) Because the Court finds that Mr. Hijoe's decision not to attend to Mr. Kilty's truck falls within the discretionary function exemption to the FTCA, it is unnecessary to assess whether such claims meet the tort claim requirements of duty and causation.

## V. CONCLUSION

For the reasons above, the Court DENIES the Bus Motion and GRANTS-IN-PART and DENIES-IN-PART the U.S. Motion. The U.S. Motion is GRANTED with respect to the claim that Mr. Hijoe's decision not to respond to reports of Defendant Kilty's truck obstructing a lane of traffic falls within the discretionary function exception to the FTCA. It is DENIED in all other respects.

The June 7, 2021 hearing is VACATED.

**IT IS SO ORDERED.**